Matter of Porter v New York City Hous. Auth. (2019 NY Slip Op 01128)





Matter of Porter v New York City Hous. Auth.


2019 NY Slip Op 01128


Decided on February 14, 2019


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on February 14, 2019

Friedman, J.P., Richter, Mazzarelli, Kapnick, Gesmer, JJ.


6049 100546/16

[*1]In re Yvonne Porter, et al., Petitioners,
v
New York City Housing Authority, Respondent.


Yvonne Porter, petitioner pro se.
David I. Farber, New York City Housing Authority, New York, (Seth E. Kramer of counsel), for respondent.



Petition, brought pursuant to CPLR article 78 (transferred to this Court by order of Supreme Court, New York County [Andrea Masley, J.], entered January 13, 2017), seeking to annul determination of respondent, dated December 14, 2015, which, to the extent challenged, after a hearing, denied petitioner Yvonne Porter's grievance seeking succession rights as a remaining family member to the tenancy of her late mother, held in abeyance, and the proceeding remanded to respondent for further proceedings in accordance with this order.
Petitioner Yvonne Porter seeks succession rights to the apartment of her late mother, who lived in the Borinquen Plaza Houses, owned by respondent, New York City Housing Authority (NYCHA). She can qualify for succession rights by showing, in addition to meeting the financial requirements, that she resided with her mother in the apartment continuously for a year or more before her mother's death, either with NYCHA's written permission or by showing that circumstances exist that relieve her of the written permission requirement (see Matter of Russo v New York City Hous. Auth., 128 AD3d 570, 571 [1st Dept 2015]; Matter of Gutierrez v Rhea, 105 AD3d 481, 485-486 [1st Dept 2013], lv denied, 21 NY3d 861 [2013]; Matter of Detres v New York City Hous. Auth., 65 AD3d 442, 443 [1st Dept 2009]). In reaching her determination adverse to Porter, the Hearing Officer failed to consider Porter's argument that she had met her burden by showing that she had lived in the apartment for the required period with the knowledge of the NYCHA project manager. Accordingly, we remand to respondent for a determination of this issue.
Factual and Procedural History
On January 31, 2014, Porter's request for succession rights was denied after an informal hearing before the Borough Manager. Porter then requested and was granted a formal hearing. On November 19, 2015, Hearing Officer Arlene Ambert took testimony from Porter, her son, a family friend, and Terry Gray, a NYCHA employee who had worked in Borinquen Plaza since about 2013.[FN1]
It is undisputed that Porter's mother, Hattie Speights, moved into an apartment in Borinquen Plaza II in or about 1976, with her family, including Porter. Porter testified that she moved out in or about 1989 and that she resided in the apartment again from about 2006 until 2008, with the knowledge of NYCHA management. Porter further testified that, in or about 2010, when Speights began to show signs of dementia, Porter moved back into the apartment to care for her mother full-time. Her mother's descent into dementia took place over time. Porter testified that she cooked for her mother, made sure she ate, and assisted with all of her mother's hygiene, hardly leaving the apartment for the next three years. She testified that her mother advised NYCHA Housing Manager Ferdinand Rios that Porter had moved back in and that Porter herself had several conversations with him, to the same effect, between November 2010 and July 2011. Documents admitted into evidence show that, as of 2010, Porter used her mother's address for her tax returns, her New York State identification and her pension plan, and that she placed the cable account for the apartment in her own name.
Porter testified that, at a meeting in or about July 2011 among herself, her mother, and Rios, in his office, she handed Rios her mother's completed "Permanent Permission Request" form. In the form, which was admitted into evidence, Speights requested that Porter be added to the household, and stated, "I am disabled and no longer able to live alone. I need my daughter to help me day and night." Porter also testified as follows about the meeting. At the time, her mother "had a lot of lucid moments," her dementia "wasn't so bad," and she knew what she was doing when she asked to add Porter to her household [FN2]. Porter gave Rios her pension paystub to document her financial eligibility. Rios handed the documents back to Porter and said that Porter "can't go on the lease. . . . but I know that you're there, you know, everything is fine the way it is." Rios also advised Porter and her mother not to add Porter's information to the annual income affidavits.
There is no dispute that Rios did not give Porter and her mother a written decision with respect to the request [FN3]. This is not consistent with the requirements of the NYCHA Management Manual (the NYCHA Manual) and the form itself, which require that the project manager approve or deny a Permanent Permission Request in writing (see also Public Housing Law § 402-c [effective December 28, 2016, NYCHA is required to provide written denials of all requests entitling tenants to grievance hearings, including requests to add family members to the lease]).[FN4]
Counsel for NYCHA had the opportunity to have Rios testify, but chose not to do so. Accordingly, there is no testimonial evidence contradicting Porter's testimony about the July 2011 meeting and any of her other contacts with Rios.
On December 16, 2011, Porter's mother executed a power of attorney giving Porter authority to act on her behalf, including with regard to real estate transactions, government assistance, legal actions, and personal and family care.
NYCHA records admitted into evidence establish that, on April 2, 2013, Terry Gray, a NYCHA employee, called the apartment and spoke with Porter about moving Porter's mother to a smaller apartment. Porter advised Gray that moving could be detrimental to her mother, and again asked that she be added to the household. Gray scheduled a meeting between Porter and Rios the next day. On April 3, 2013, a different NYCHA employee, Ayodeji Festus, met with Porter, instead of Rios. Porter told Festus that her mother should not be moved because of her age and health issues, and again stated that she would like to be added to the household as a permanent resident. Porter also told Festus that she had already obtained the Permanent Permission Request form, and Festus advised Porter to submit proof of her income and previous address.
Porter's mother died on September 9, 2013. Porter testified that, a few days later, Rios came to the apartment and told Porter that, if she was not going to move out, she needed to write him a letter stating why she should succeed to her mother's tenancy. Porter's letter to Rios dated December 11, 2013 was admitted into evidence. In it, Porter stated that she moved back to the apartment in 2010 to care for her mother, and that, in relevant part, "I would appreciate that you acknowledge your permission and awareness of us living with my mom."
At the end of the hearing, Porter's attorney argued that, under prevailing case law, remaining family members may be granted succession rights, based on a showing that they lived in the building with the knowledge and implicit approval of the project manager, citing "McFarlan[e]" (v New York City Hous. Auth., 9 AD3d 289, 291 [1st Dept 2004]).
In her decision, the Hearing Officer denied petitioner's remaining family member grievance because a "tenant who wishes to have an additional person join or re-join the household on a permanent basis must submit a written request to the development manager and receive written approval." The Hearing Officer found that Porter's testimony
"reveals that the Property Manager did not grant permission for the Grievant to reside in the subject apartment. According to the Grievant, this disapproval was not challenged. The Grievant's explanation that because Mr. Rios did not state that she could not stay in the apartment and that the Grievant did not wish to interfere in the conversation between Mr. Rios and the Tenant to ask Mr. Rios to clarify or explain the disapproval is incredible in light of the evidence presented that the Tenant was suffering from dementia and that the Grievant was named as the Tenant's [*2]Attorney-in-fact by Power of Attorney."[FN5]
The Hearing Officer further found that, even if Porter had submitted a second Permanent Permission Request at her meeting with Festus on April 3, 2013 and it had been immediately approved, that would have been insufficient to meet NYCHA's requirement that a remaining family member reside with the tenant for one year before the tenant's departure, since Porter's mother passed away approximately five months later. However, the Hearing Officer failed to make a determination on Porter's argument that she is excused from the written consent requirement because she resided with her mother in the apartment with the project manager's knowledge and/or tacit approval.
Acting pro se, Porter filed an article 78 petition challenging the Hearing Officer's determination. She argued that the determination was not supported by substantial evidence because, inter alia, the Hearing Officer found that Porter had a power of attorney to act on her mother's behalf in July 2011 despite the fact that her mother did not execute the power of attorney until December 2011. Porter also argued that NYCHA should have given her succession rights based on NYCHA's "verbal and implicit approval."
The article 78 court transferred the matter to this Court pursuant to CPLR 7804(g).[FN6]
Analysis
The Hearing Officer's finding as to Porter's explanation for why she did not seek clarification from Rios in July 2011 was based on her mistaken belief that Speights was unable to understand or speak for herself and that Porter had a power of attorney to act on her mother's behalf at that time. However, Porter did not have the power of attorney until December 2011, five months after the July 2011 meeting with Rios, and she testified that her mother was not totally debilitated, was lucid at the July 2011 meeting, and understood what she was doing when she asked that Porter be added to the household. Contrary to the dissent's claim, our scrutiny of the basis for the Hearing Officer's finding is entirely consistent with our obligation under Matter of Haug v State Univ. of N.Y. at Potsdam, 32 NY3d 1044 [2018]) to defer to administrative findings that are supported by substantial evidence. We find that the Hearing Officer's factual determination, in this one respect, is not supported by substantial evidence and is contradicted by the documentary and testimonial evidence.[FN7]
The Hearing Officer's decision failed to address one of Porter's primary arguments. This error is appropriately remedied by a remand (see generally A.F.C. Enters., Inc. v New York City Tr. Auth., 79 AD3d 514 [1st Dept 2010]). At the hearing, Porter contended that she resided in the apartment with the project manager's knowledge and/or implicit approval, and thus is entitled to remaining family member status on that basis. The Hearing Officer did not address this claim, and, instead, rejected the petition solely because NYCHA had failed to give written permission for Porter to reside in the apartment [FN8]. However, in McFarlane (9 AD3d 289), this court stated that
"[o]ne type of circumstance that could be of critical importance in establishing a right to be treated as a remaining family member despite the absence of notice or written consent would be a showing that the Authority was aware of the petitioner having taken up residence in the unit, and implicitly approved it" (9 AD3d at 291).
We have repeatedly stated since McFarlane that, where petitioner in a remaining family member grievance demonstrates that NYCHA "knew or implicitly approved of" petitioner's residence in a NYCHA apartment with the tenant, petitioner may be relieved of the written consent requirement (see Matter of Echeverria v New York City Hous. Auth., 85 AD3d 580, 581 [1st Dept 2011]; see also Matter of Taylor v Olatoye, 154 AD3d 634 [1st Dept 2017]; Matter of Russo, 128 AD3d at 571; Matter of Gutierrez, 105 AD3d at 485-486; Matter of Filonuk v Rhea, 84 AD3d 502, 503 [1st Dept 2011]; Matter of Detres, 65 AD3d at 443).
Respondent argues, and our dissenting colleague agrees, that granting the petition would be inconsistent with the principle that "estoppel cannot be invoked against a governmental agency to prevent it from discharging its statutory duties" (Matter of Schorr v New York City Dept. of Hous. Preserv. and Dev., 10 NY3d 776, 779 [2008] [internal quotation marks omitted]; see also Matter of Jian Min Lei v New York City Dept. of Hous. Preserv. & Dev., 158 AD3d 514, 515 [1st Dept 2018]). However, this argument is inapposite here.
As an initial matter, Porter has not argued estoppel. Moreover, granting Porter's petition would not cause NYCHA to run afoul of its statutory duties, because there is no federal statute or regulation that requires that NYCHA's consent to a permanent residency request be in writing. Contrary to our dissenting colleague's assertion that the written consent requirement is "federally mandated," there is no federal law or regulation requiring written consent, and none of the cases cited by the dissent says that there is. The applicable federal regulation requires only that the primary tenant make a request (24 CFR 966.4[a][1][v]), which occurred here. The written consent requirement appears only in the NYCHA Manual. Moreover, contrary to the dissent's position, the lease does not adopt the provision from the NYCHA Manual but rather follows the federal regulation to permit occupancy without written consent by an individual who has been [*3]"authorized by the Landlord" and has remained "in continuous occupancy . . . since such authorization."
Accordingly, neither the letter of the applicable regulation, which does not require written consent (CFR 966.4[a][1][v]), nor the express purpose of the statutory scheme (42 USC § 1437[a][1][B], [4] ["It is the policy of the United States . . . to assist States . . . to remedy the . . . acute shortage of decent and safe dwellings for low-income families . . . [and] that our Nation should promote the goal of providing decent and affordable housing for all citizens"]) would be thwarted by a determination that Porter is excused from the written consent requirement. As the Court of Appeals has recognized, affording succession rights to financially eligible family members is entirely consistent with a legislative goal of providing housing to low-income people (Matter of Murphy v New York State Div. of Hous. & Community Renewal, 21 NY3d 649, 653 [2013]).
For this reason, this case is distinguishable from Schorr. In that case, petitioner was denied succession rights in a Mitchell-Lama apartment because he did not meet a statutory requirement that he have resided in the apartment for two years immediately before the primary tenant's departure (28 RCNY 3-02[p][3]). Accordingly, the Court of Appeals found that the building management's acquiescence in his occupancy could not estop the New York City Department of Housing Preservation and Development, which was unaware of petitioner's occupancy, from discharging its duty to ensure that residents comply with statutory requirements (Schorr, 10 NY3d at 778, n 2, 779). In contrast, here, as discussed above, there is no relevant statutory requirement.
Respondent and the dissent also cite to cases in which we have held that even if NYCHA "was aware that petitioner was living in the apartment . . . respondent may not be estopped from denying petitioner's grievance" (Matter of Andrade v New York City Hous. Auth., 132 AD3d 598, 598-599 [1st Dept 2015]). However, in these cases, NYCHA had a valid reason to deny the remaining family member grievance, aside from a lack of written consent. In most of these,[FN9] the tenant never requested that the petitioner be added as a permanent resident, in violation of the governing federal regulations (24 CFR 966.4[a][1][v]; see Andrade, 132 AD3d 598; Matter of Gonzalez v New York City Hous. Auth., 112 AD3d 531 [1st Dept 2013]; Matter of Adler v New York City Hous. Auth., 95 AD3d 694 [1st Dept 2012], lv dismissed [upon petitioner's death] 20 NY3d 1053 [2013]; Rosello v Rhea, 89 AD3d 466 [1st Dept 2011]; Matter of Edwards v New York City Hous. Auth., 67 AD3d 441 [1st Dept 2009]).[FN10]
Because the Hearing Officer failed to address Porter's argument that she was entitled to remaining family member status on the basis that she resided with her mother with NYCHA's consent or approval, the record precludes an adequate review by this Court (see Matter of City of New York v Contract Dispute Resolution Bd. Of the City of N.Y., 110 AD3d 647 [1st Dept 2013], lv denied 22 NY3d 862 [2014]; A.F.C. Enters., Inc., 79 AD3d at 515). Therefore, we hold the petition in abeyance and remand the proceeding to NYCHA for a determination, on the existing record, of that issue (see Gutierrez, 105 AD3d at 485-486), and, should
NYCHA determine that Porter is excused from the written consent requirement, for a determination of Porter's income eligibility.
All concur except Friedman, J.P.
who dissents in a memorandum as follows:




FRIEDMAN, J.P. (dissenting)
 In this article 78 proceeding transferred to this Court pursuant to CPLR 7804(g), the primary question presented is whether an administrative determination


rendered by respondent New York City Housing Authority (NYCHA), after an evidentiary hearing, is, "on the entire record, supported by substantial evidence" (CPLR 7803[4]). This is a highly deferential standard of review that, contrary to the majority's view, is plainly satisfied here.
Indeed, the Court of Appeals has very recently reiterated the extremely limited scope of judicial review under the substantial evidence standard:
"Upon judicial review, the Appellate Division must accord deference to the findings of the administrative decision-maker. . . . [N]either the Appellate Division nor the Court of Appeals has power to upset the determination of an administrative tribunal on a question of fact; the courts have no right to review the facts generally as to weight of evidence, beyond seeing to it that there is substantial evidence.
"We emphasize that the substantial evidence standard is a minimal standard. It is less than a preponderance of the evidence, and demands only that a given inference is reasonable and plausible, not necessarily the most probable. Stated differently, rationality is what is reviewed under the substantial evidence rule; substantial evidence is such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact. Where substantial evidence exists, the reviewing court may not substitute its judgment for that of the agency, even if the court would have decided the matter differently.
"Often there is substantial evidence on both sides of an issue disputed before an administrative agency. Where substantial evidence exists to support a decision being reviewed by the courts, the determination must be sustained, irrespective of whether a similar quantum of evidence is available to support other varying conclusions" (Matter of Haug v State Univ. of N.Y. at Potsdam, 32 NY3d 1044, 1045-1046 [2018] [citations, alterations, ellipses and internal quotation marks omitted]).
Petitioner is challenging NYCHA's denial of her claim to succession, as a remaining [*4]family member (RFM), to her late mother's tenancy in a 5½-room apartment in an NYCHA residential complex. NYCHA's rules, adopted to comply with applicable federal law, require that petitioner's RFM claim be supported, in pertinent part, by proof that she resided in the apartment lawfully, pursuant to NYCHA's written consent, continuously for at least one year before her mother's death (see NYCHA Management Manual [hereinafter, the Manual], ch I, § XII[A][1], [2])[FN11]. Petitioner concedes that she never obtained NYCHA's written permission to join her mother's household at any point between November 2010, when she allegedly moved back into the apartment, and September 2013, when her mother died [FN12]. However, petitioner argues here, as she did through counsel before the NYCHA Hearing Officer, that the requirement of written consent should be excused based on her testimony that the NYCHA project manager had knowingly acquiesced to her occupancy since 2011.
In the decision rejecting petitioner's claim to succession rights, the NYCHA Hearing Officer found "incredible" petitioner's testimony that, at a meeting in July 2011, the project manager, while refusing to issue written consent to petitioner's occupancy of the apartment (such written consent being required by the lease and the Manual), had given oral consent to such occupancy. Thus, entirely without merit is the majority's characterization of the determination as deficient because the Hearing Officer "failed to consider [petitioner's] argument that she had met her burden by showing that she had lived in the apartment for the required period with the knowledge of the NYCHA project manager." On the contrary, the Hearing Officer gave this argument due consideration and rejected the testimony on which it was based as "incredible." While the majority is entitled to disagree with that assessment, CPLR article 78 does not empower us to annul an administrative determination based on a disagreement with the Hearing Officer's judgment of a witness's credibility, as the Court of Appeals just made eminently clear in Haug.
Moreover, the Hearing Officer had ample grounds on this record to discredit petitioner's testimony. Petitioner testified that, at the July 2011 meeting, she had not objected to the project manager's refusal to add her to the lease because she had not wished to interfere in the conversation between the project manager and her mother, who allegedly had also been present. The Hearing Officer found this testimony incredible because it was inconsistent with petitioner's previous testimony that, at the time of the alleged meeting, her mother had been afflicted with dementia [FN13]. Moreover, the Hearing Officer's disbelief of petitioner's testimony concerning the July 2011 meeting finds further support in an NYCHA employee's testimony that the agency has no record of any such meeting, although it is NYCHA's policy to make a record of all interviews with residents. In this regard, the NYCHA employee testified that the earliest reference in the agency's files to petitioner's occupancy is the record of a discussion in April 2013 — only five months before her mother's death — in which petitioner asked that she and her adult son be added to the household.
Inasmuch as the determination under review is based on the Hearing Officer's findings of fact, we are bound to confirm the determination if those finding are, as previously noted, "on the entire record, supported by substantial evidence" (CPLR 7803[4]). As the foregoing summary of [*5]the most salient evidence should suffice to show, the substantial evidence standard — as authoritatively interpreted by the Court of Appeals (see e.g. Haug, 32 NY3d at 1045-1046) — is satisfied here. Further, even if we had the power to disturb NYCHA's resolution of the factual issues presented to it (which we do not), as a matter of law, "estoppel is not available as a remedy to prevent a governmental agency from discharging its statutory duties" (West Midtown Mgt. Group, Inc. v State of N.Y., Dept of Health, Off. of the Medicaid Inspector Gen., 31 NY3d 533, 541-542 [2018], citing, inter alia, Matter of Schorr v New York City Dept. of Hous. Pres. & Dev., 10 NY3d 776, 779 [2008]). That a government agency, such as NYCHA, cannot be estopped to discharge its lawful duties is a blackletter legal principle that, contrary to the majority's mistaken view, the Court of Appeals has never abandoned, and to which this Court is therefore bound to adhere, notwithstanding statements — the majority of which are mere dicta — suggesting otherwise in a handful of cases cited by the majority.[FN14]
For the foregoing reasons (which are more fully elaborated below), I respectfully dissent from the majority's implicit annulment of NYCHA's evidence-based and entirely rational resolution of this matter, a determination that is entitled to confirmation as a matter of law.[FN15]
Legal Background
The Legislature created NYCHA to provide housing to low-income families in New York City, vesting the agency with the power to impose eligibility standards (see Public Housing Law §§ 3[2]; 37[1][w]; 156; 401). NYCHA, as a recipient of funding from the federal Department of Housing and Urban Development (HUD), must comply with HUD regulations, which require NYCHA to "establish and adopt written policies for admission of tenants" (24 CFR 960.202[a][1]). HUD regulations mandate that NYCHA's leases with its tenants state, inter alia:
"The composition of the household as approved by [NYCHA]. The family must promptly inform [NYCHA] of the birth, adoption, or court-awarded custody of a child. The family must request [NYCHA] approval to add any other family member as an occupant of the unit" (24 CFR 966.4[a][v] [emphasis added]).
The Manual provides that, for a new person to be added as a permanent member of a tenant's household (other than through "family growth," i.e., birth, adoption or an award of custody), "the tenant must make a written request to the Housing Manager by submitting" a document known as the "Permanent Residency Permission Request form" (Manual, ch I, § XI[B][2]). This rule applies to previously authorized household members "who moved out of the household and seek[] permission to rejoin the household" (Manual, ch I, § XI[B][2][a][2][c] ["Person Seeking to Rejoin the Family"]). The Manual elaborates on this point as follows:
"A person in this category does not automatically obtain permanent residency permission by virtue of his/her former occupancy, notwithstanding NYCHA's actual or constructive notice of the person's return to the apartment. Such a person may obtain permanent residency permission only if the tenant requests
permanent residency permission and the Housing Manager grants permanent residency permission in writing" (id.).
This requirement is set forth in the NYCHA lease signed by petitioner's mother.[FN16]
NYCHA's RFM policy "defines who may succeed to a lease as a remaining family member after a tenancy ends[,] i.e., the tenants/lessees move out of the apartment or die" (Manual, ch I, § XII). As here relevant, a person claiming RFM status (other than as an original member of the household or as a member added through family growth) must establish that he or she (1) "[o]btained Permanent Residency Permission (i.e.[,] written permission) from the Housing Manager" (id., ch I, § XII[A][1][c]), (2) has "remain[ed] in continuous occupancy (i.e., [has been named] on all Occupant's Affidavits of Income) from the date of issuance of the Housing Manager's written Permanent Residency Permission for not less than one year immediately prior to the date the tenant vacates the apartment or dies" (id., ch I, § XII[A][2][a]), and (3) is otherwise eligible for public housing (id., ch I, § XII[B]).
As referenced in the previous paragraph, to satisfy the continuous occupancy requirement for RFM status, a claimant must "be named on all affidavits of income from the time (s)he lawfully enters the apartment" (Manual, ch I, § XII[A][2]). This refers to the annual affidavit of income that a tenant is required to file, setting forth the name of each member of the household and his or her income. The affidavit-of-income forms executed by petitioner's mother, as tenant, from 2010 through 2013 include the following direction to the tenant:
"List all occupants living in your apartment. Failure to do so may deprive them of all rights of occupancy. No person is allowed to reside in your apartment except authorized members of your family (which is based on authorized original family members who remain in continuous residence and births), unless written permission is REQUESTED by you and GRANTED by Property Management."
A claim for RFM succession rights is first raised with the manager of the development where the apartment is located. If the manager denies the claim, and the district office upholds the denial, the claimant may file a grievance and request an evidentiary hearing before an impartial hearing officer. At such a hearing, "[t]he RFM claimant has the burden of proof to demonstrate that (s)he qualifies for a lease" (Manual, ch I, § XII[C][2]). "At the hearing, before the Impartial Hearing Officer, the RFM claimant must clearly demonstrate that (s)he:
• Meets the standards for Remaining Family Member' status (per Section XII, A) and,
• Meets the criteria for Eligibility for a Lease/Occupancy of a NYCHA Apartment' (per Sections XII. B.), and
• Is paying use and occupancy" (id., ch I, § XII[D][5][b]).
The decision of the hearing officer is subject to review and possible revision by the NYCHA board, which renders the final administrative determination.
[*6]The Administrative Record
Petitioner's mother, Hattie Speights, who for many years had been the tenant of the subject apartment in the Borinquen Plaza Houses in Brooklyn, died on September 9, 2013, at the age of 82. By letter to Ferdinand Rios, the project's housing manager, dated December 11, 2013, petitioner asserted a claim for RFM succession rights to the apartment on her own behalf and on behalf of her adult son, Tyvon Peterson (Tyvon)[FN17]. After Rios denied the request, and the denial was upheld by the district management office, petitioner requested a formal hearing by letter dated February 19, 2014. The hearing on which the determination under review was based was held before Hearing Officer Arlene Ambert on November 19, 2015. Petitioner was represented by counsel at the hearing.[FN18]
Petitioner's Testimony
Petitioner testified that, after her mother, Hattie Speights, had colon surgery in 2006, she was left with a colostomy bag and had a full-time attendant for five days per week. Around the middle of 2010, Speights developed dementia. The decline in Speights's health prompted petitioner to move back into her mother's apartment in November 2010. Petitioner testified that she did "[e]verything" for her mother, who by that time was so diminished in capacity that she could not even make phone calls. Petitioner introduced into evidence a power of attorney, executed by Speights in December 2011, making petitioner her mother's attorney-in-fact.
Petitioner introduced into evidence the following documentation identifying her mother's apartment as her address: (1) tax returns for 2010, 2011 and 2012; (2) a July 2011 Verizon pension statement; (3) a June 2011 Time Warner Cable bill; (4) a New York State non-driver identification card issued to petitioner in February 2010; (5) a New York City Human Resources Administration Adult Protective Services notice of attempted visit.
Petitioner testified that, in April or May 2011, she had a conversation with Rios, the project manager, in which she told him that she had returned to reside permanently in the apartment. Petitioner subsequently obtained a Permanent Permission Request form (PPR) for the purpose of obtaining NYCHA's consent to her residence in the apartment.
Petitioner testified that, in July 2011, she and her mother met with Rios in his office and presented him with a completed PPR, dated July 1, 2011, a copy of which was received into [*7]evidence [FN19]. According to petitioner, Rios looked at the PPR and acknowledged his awareness that petitioner was residing in the apartment. However, he told petitioner that she could not be placed on the lease, and gave the PPR back to petitioner, without filling out the portion to be completed by NYCHA. Petitioner testified that Rios told her, in substance: "I already know the situation. I know you been here, . . . but you can't go on the lease, but I know that you're there, you know, everything is fine the way it is."
Petitioner testified that she did not ask why Rios was rejecting the PPR because "[h]e was talking with my mom so I really didn't get involved, you know." Petitioner also claimed that she was unaware that she could have challenged Rios's rejection of the PPR, testifying that she "thought that his decision was final."[FN20] After the July 2011 meeting, Rios allegedly visited the apartment three times in connection with rent delinquencies and spoke to petitioner on each of those occasions.
In March or April of 2013, petitioner met with Housing Assistant Ayodeji Festus, who advised her that Speights needed to move to a smaller apartment, or "downsize," because she had two unoccupied bedrooms, but stated that if petitioner were added to the lease, she would be able to avoid downsizing. Petitioner claims that, at that time, Festos knew that petitioner was living in the apartment.
As noted, Speights died on September 9, 2013. A few days after the funeral, petitioner testified, Rios and anther NYCHA representative visited the apartment, asked petitioner whether she was about to move out ("You leaving?"), and told her that they were "going to take the apartment back" and that she would have "to write a letter proving that [she was there] for two years and why [she] [felt] that [she] should succeed [to] the apartment."
Petitioner was familiar with the affidavits of income completed by her mother. Petitioner or the home attendant helped Speights complete the affidavits. Petitioner explained that the affidavits of income for the years she was residing in the apartment did not list her as part of the household because Rios, at the July 2011 meeting, had instructed her not to put any information about herself on the affidavits.
Speights's affidavits of income for 2012 and 2013 set forth, as an emergency contact, Tyvon Peterson of 25 Boerum Street, who is identified as her "grandson." Petitioner — who was taking the position that her son Tyvon Peterson resided in Speights's apartment during this [*8]period — claimed that her mother, in completing these affidavits, had intended to refer to Tyvon's father, Tyrone Peterson, as an emergency contact. Petitioner claimed that her mother had misspelled Tyrone's first name, and was not referring to Tyvon. When it was brought to her attention that the affidavits of income identified the contact as the tenant's "grandson," petitioner conceded that her mother might have meant Tyvon, but she could not explain why he was listed at the Boerum Street address.
Testimony of Housing Assistant Terry Gray
Terry Gray, a Housing Assistant or Specialist employed by NYCHA at Borinquen Plaza, authenticated various documents relating to Speights's tenancy, including (1) Speights's lease; (2) the "Tenant Data-Summary" forms pertaining to Speights; (3) Speights's affidavits of income executed in 2010, 2011, 2012 and 2013; and (4) NYCHA's tenant interview records pertaining to the subject apartment for the period between April 2008 and January 2014.
The tenant interview records placed into evidence do not make reference to petitioner's occupancy until the entry for April 2, 2013. That entry, and the one for the following day, read as follows (capitalization in original):
"DETAILS ENTERED ON 20130402 BY TERRY GRAY, H.A.
CALLED TOR [tenant of record] AND SPOKE TO HER DAUGHTER YVONNE [i.e., petitioner], WHO STATED HER MOTHER WOULD BE DEVASTATED IF SHE HAD TO MOVE DOWN TO THE CORRECT SIZE APT. TOR IS 82YS OLD. I EXPLAINED TO DAUGHTER THAT HER MOTHER MUST MOVE DOWN. RESIDENT DAUGHTER STILL FEELS HER MOTHER HAS RIGHTS TO REMAIN IN APT. APPOINTMENT MADE TO SPEAK WITH MANAGER ON 4/3/13.
"DETAILS ENTERED ON 20130403 BY AYODEJI FESTUS, H.A.
TOR'S DAUGHTER YVONNE PORTER IN THE OFFICE REGARDING UNDER OCCUPIED APT. SHE STATED THAT HER MOTHER CAN NOT DOWN SIZE BECAUSE OF HER AGE AND HEALTH ISSUES. SHE STATED THAT SHE HAS BEEN LIVING IN THE APT FOR OVER 30+ YEARS AND SHE MIGHT DIE IF SHE IS REMOVED FROM THE FAMILIAR ENVIRONMENT. SHE STATED THAT SHE WOULD LIKE TO ADD HERSELF AND HER SON TO THE HOUSEHOLD. SHE ALREADY OBTAINED THE PERMISSION REQUEST FORM. I ADVISED HER TO SUBMIT B/C S.S. CARD PROOF OF INCOME AND PROOF OF PREVIOUS ADDRESS."
Gray, who was familiar with Speights's tenant file, confirmed that the file did not contain any PPR forms seeking permission to add petitioner or Tyvon to the household dated before Speights's death on September 9, 2013. Further, Gray had spoken with Rios, the Housing Manager, and Rios had no recollection of petitioner or Tyvon. Gray also confirmed that NYCHA requires housing assistants and managers to enter the substance of all apartment-related conversations and transactions into a resident's file and that the interview records pertaining to the subject apartment did not include any notation of a request to add petitioner to the household until April 2013.
Decision of the Hearing Officer
The Hearing Officer rendered a decision, dated December 14, 2015, denying the grievances of both petitioner and Tyvon. In rejecting petitioner's claim, the Hearing Officer wrote:
"The Grievant's [i.e., petitioner's] testimony regarding the conversation with Mr. Rios in 2011 reveals that the Property Manager did not grant permission for the Grievant to reside in the subject apartment. According to the Grievant, this disapproval was not challenged. The Grievant's explanation that because Mr. Rios did not state that she could not stay in the apartment and that the Grievant did not wish to interfere in the conversation between Mr. Rios and the Tenant to [*9]ask Mr. Rios to clarify or explain the disapproval is incredible in light of the evidence presented that the Tenant was suffering from dementia and that the Grievant was named as the Tenant's Attorney-in-Fact by Power of Attorney (Exhibit 8).
"Considering the evidence in the light most favorable to the Grievant, even if the Permanent Permission Request form together with the required additional documentation had been submitted on April 3, 2013, the date the Grievant discussed the matter with Housing Assistant Festus (Exhibit D) and the request had been immediately approved by Management, the Grievant would have been residing in the subject apartment for approximately five (5) months with the permission of Management prior to the passing away of the Tenant on September 9, 2013 (Exhibit 1)."
The Determination of NYCHA
By notice dated January 15, 2016, NYCHA advised petitioner that, "[i]n accordance with the Hearing Officer's decision and disposition in this proceeding, the grievance . . . is not sustained." Petitioner, acting pro se, subsequently commenced this proceeding challenging the determination.
Discussion
NYCHA's Determination, Insofar as Based on Factfinding, Is Supported by Substantial Evidence
As noted at the outset of this writing, the substantial evidence standard of review applicable upon an article 78 challenge to an administrative determination made after an evidentiary hearing is extremely deferential. That standard is even "less than a preponderance of the evidence" (Haug, 32 NY3d at 1045 [internal quotation marks omitted]), and confers on this Court "no right to review the facts generally as to weight of evidence, beyond seeing to it that there is substantial evidence" (id. [internal quotation marks omitted]). We must confirm the determination so long as "[the] inference [drawn by the agency] is reasonable and plausible, [even if] not necessarily the most probable" (id. at 1046 [internal quotation marks omitted]). Under this "minimal standard" (id. at 1045 [internal quotation marks omitted]), NYCHA's rejection of petitioner's claim to RFM status plainly passes muster.
The heart of petitioner's claim is that the requirement of NYCHA's written consent to her occupancy of the apartment should be excused because of what allegedly transpired at the July 2011 meeting. At that meeting, according to petitioner, while Rios refused to issue written consent or to act on the PPR petitioner and her mother had given him, he orally told petitioner and her mother that petitioner could continue to reside in the apartment. Assuming that proof of such conduct by Rios would excuse the requirement of written consent (which, as more fully discussed below, it would not), the NYCHA Hearing Officer found that petitioner's testimony concerning the July 2011 meeting was "incredible." While the majority might reasonably disagree with this finding of fact, upon a review of the entire record, substantial evidence to support the finding is readily apparent. To reiterate, "rationality is what is reviewed under the substantial evidence rule" (id. at 1046 [internal quotation marks and alterations omitted]), and, on this record, it cannot be said that the Hearing Officer's finding of fact was irrational.
Initially, contrary to the majority's mischaracterization of the Hearing Officer's decision, the articulated basis for the rejection of petitioner's account of the alleged July 2011 meeting was petitioner's own testimony that, as of the time of that meeting, her mother was already "suffering from dementia." Petitioner's admission of her mother's dementia at that time renders untenable her testimony that she failed to raise any objection to Rios's alleged refusal to put her on the lease because "[h]e was talking with my mom so I really didn't get involved." If Speights was demented at the time of the meeting — and petitioner herself testified that her mother's dementia was a large part of her reason for having moved into the apartment the previous November — it is inconceivable that petitioner would have been passive at the meeting because (as petitioner [*10]also testified) her mother "was discussing [the matter] with [Rios] and he made her feel comfortable." Moreover, as previously noted, the PPR form that petitioner claims to have tendered to Rios at the meeting plainly states, "If permanent permission is not granted (disapproved), you may request a grievance hearing to review the Development Manager's decision." Thus, petitioner was on notice that Rios did not have the last word.
The Hearing Officer wrote that she found petitioner's account of the July 2011 meeting "incredible in light of the evidence presented that the Tenant was suffering from dementia and that [petitioner] was named as the Tenant's Attorney-in-Fact by Power of Attorney." The majority, in search of a rationale for setting aside this utterly rational determination, focuses on the Hearing Officer's reference to the power of attorney, while completely ignoring the Hearing Officer's primary reliance on petitioner's testimony that her mother had developed dementia by the time of the July 2011 meeting. Seizing on the fact that the power of attorney was not executed until December 2011, the majority baselessly takes the Hearing Officer's reference to that document to mean that the Hearing Officer based her decision solely on "[the] mistaken belief that . . . [petitioner] had a power-of-attorney to act on her mother's behalf at that time [of the meeting]."
Contrary to the majority's characterization of her decision, the Hearing Officer placed primary reliance on petitioner's own sworn testimony that Speights had dementia at the time of the meeting [FN21]. Nowhere does the Hearing Officer's decision assert that the power of attorney existed at the time of the July 2011 meeting. On the contrary, in the decision's summary of petitioner's evidence, the Hearing Officer noted that the power of attorney had been executed in December 2011. Plainly, the power of attorney was referenced in the context of the credibility finding only to illustrate Speights's reliance on petitioner as a result of her dementia, which — by petitioner's own account at the hearing — had existed since the middle of 2010. The essential basis of the Hearing Officer's credibility finding was the admitted fact of Speights's dementia at the time (which the Hearing Officer mentioned first), not the subsequently executed power of attorney.[FN22]
Attacking the Hearing Officer's credibility determination from another angle, the majority asserts that petitioner testified that her mother "was lucid at the July 2011 meeting." As previously discussed, this mischaracterizes petitioner's testimony, which was to the effect that, in July 2011, her mother still had "lucid moments" and was having such a moment when she signed the PPR, after petitioner filled out the document and explained it to her. Nowhere did petitioner [*11]testify that Speights was "lucid" at the July 2011 meeting. In fact, to reiterate, petitioner specifically complained at the hearing that, at the July 2011 meeting, Rios had been "speaking to someone that he was aware that was disabled, and my mother certainly was disabled . . . she had dementia." Thus, whether or not Speights was temporarily experiencing a "lucid moment[]" during the July 2011 meeting (and there is no evidence that she was), the Hearing Officer was entitled to discredit petitioner's testimony that she deferred at the meeting to her elderly and (by petitioner's own account) cognitively disabled mother. While it might also be reasonable for the majority to reach a different conclusion, the credibility determination was for the Hearing Officer, and not this Court, to make. So long as that determination is rational (as it plainly is), we have no authority to disturb it.
Further, substantial evidence review requires us to determine whether the administrative determination is supported by substantial evidence "on the entire record" (CPLR 7803[4])[FN23]. In this regard, the Hearing Officer's finding is supported by additional evidence from the administrative record.
First, petitioner was not identified as a member of the household on any of Speights's affidavits of income from the relevant period.
Second, the alleged July 2011 meeting is not reflected anywhere in the interview record relating to the subject apartment, although NYCHA policy calls for a record to be made of all substantive interactions between management and residents. Indeed, not only is there no notation of the meeting itself, but also the record of petitioner's discussion with Housing Assistant Festus on April 3, 2013, does not reflect that petitioner ever mentioned to Festus the alleged July 2011 meeting with Rios.[FN24]
Third, Housing Assistant Gray testified that Rios told her that he had no recollection of petitioner. The majority appears to dismiss the lack of corroboration for petitioner's testimony from these sources as resulting entirely from Rios's determination not to create a record of his oral acquiescence to petitioner's occupancy of the apartment, the sole evidence for which is petitioner's self-serving testimony that Rios told her at the July 2011 meeting not to make reference to herself in filling out her mother's affidavits of income. The Hearing Officer, however, was not required to assume that Rios was guilty of such faithlessness to his employer — especially in the absence of any apparent motive he might have had to act in such a fashion. The majority itself suggests no such motive.
The Hearing Officer's rejection of petitioner's testimony concerning the alleged July 2011 meeting finds additional support in petitioner's testimony concerning the reference to Tyvon Peterson as an emergency contact in two of Speights's affidavits of income. Again, petitioner and her son Tyvon were co-grievants at the hearing, claiming that Tyvon had also resided in Speights's apartment during the period at issue. This claim was contradicted by the [*12]reference in two of Speights's affidavits of income to a person identified as "Tyvon Peterson," with an address at 25 Boerum Street, as an emergency contact. As previously noted, petitioner at first insisted that the person to whom her mother had intended to refer had been Tyvon's father, Tyrone Peterson, who lived at 25 Boerum Street. Petitioner relented, however, when it was pointed out to her that the affidavits plainly identified the emergency contact as the tenant's "grandson." The Hearing Officer was entitled to give this testimony whatever weight she saw fit in considering petitioner's credibility as a whole.
In an attempt to justify its upsetting of NYCHA's rational determination, the majority states that "there is no testimonial evidence contradicting [petitioner's] testimony about the July 2011 meeting and any of her other contacts with Rios." The majority's apparent assumption that the Hearing Officer was not entitled to reject petitioner's testimony based on hearsay or circumstantial evidence is simply wrong, as the Court of Appeals has just reiterated. Even in the absence of contradictory evidence, the Hearing Officer was entitled to discredit petitioner's self-serving and uncorroborated testimony on any rational grounds — which, as just discussed, were plainly available here. Further, "hearsay is admissible as competent evidence in an administrative proceeding, and if sufficiently relevant and probative may constitute substantial evidence even if contradicted by live testimony on credibility grounds" (Haug, 32 NY3d at 1046).
In Haug, the Court of Appeals concluded that the respondents' determination was supported by hearsay evidence, as well as by conduct conceded by the petitioner that "could have [been] reasonably interpreted . . . as consciousness of guilt," supporting the conclusion that "his version of the events was not credible" (id.). In this case, the version of the relevant events to which petitioner testified was not substantiated by the documentary record or corroborated by Rios's recollection, as recounted to Gray. Moreover, the Hearing Officer had ample grounds on which to discredit petitioner's self-serving testimony, including her claim to have deferred to her dementia-afflicted mother at the July 2011 meeting and her dubious testimony concerning the use of Tyvon as her mother's emergency contact. Here, as in Haug, "it was the province of the [H]earing [Officer] to resolve any conflicts in the evidence and make credibility determinations," and this Court has no warrant to "engag[e] in a re-weighing of the evidence . . . [or to] substitute[] its own factual findings for those of respondent[]" (id. at 1046-1047).
Although it was petitioner who bore the burden of proof at the hearing, the majority appears to fault NYCHA for having "had the opportunity to have Rios testify, but [having] chose[n] not to [call him]." Aside from the fact that Gray's testimony that Rios had told her that he had no recollection of any interaction with petitioner was (as stated in Haug) fully "admissible as competent evidence in an administrative proceeding" (id. at 1046), the majority ignores the fact that Rios had, in fact, already given testimony consistent with Gray's recounting of his lack of recollection. Specifically, at the initial aborted hearing on petitioner's grievance, Rios had appeared and testified that he had no recollection of any interaction with petitioner. Thus, at the hearing de novo before Hearing Officer Ambert, the parties were well aware of the probable substance of the testimony Rios would give if he were called, and neither side thought it worthwhile to call him.[FN25]
No Basis Exists for the Majority's Remand to NYCHA; the Determination Should Either be Confirmed or Annulled
The foregoing, I believe, more than suffices to show that the majority seriously mischaracterizes the Hearing Officer's decision when it asserts that Hearing Officer "failed to make a determination on [petitioner's] argument that she is excused from the written consent requirement because she resided with her mother in the apartment with the project manager's knowledge and/or tacit approval." Manifestly, in rejecting petitioner's testimony about the July 2011 meeting as "incredible," the Hearing Officer made such a finding, albeit one with which the majority disagrees. Whether or not the majority's disagreement is reasonable, the Hearing Officer's findings of fact and credibility, as adopted by NYCHA, are controlling, so long as those findings are supported by substantial evidence. "Where substantial evidence exists to support a decision being reviewed by the courts, the determination must be sustained, irrespective of whether a similar quantum of evidence is available to support other varying conclusions" (Haug, 32 NY3d at 1046 [internal quotation marks omitted]).
Since the Hearing Officer plainly did "address [petitioner's] argument that she was entitled to remaining family member status on the basis that she resided with her mother with NYCHA's consent or approval," the majority is simply wrong in stating that "the record precludes an adequate review by this Court," on which ground it remits the proceeding back to NYCHA for further evidentiary proceedings. Indeed, the majority contradicts its statement concerning the supposed inadequacy of the existing record by critically scrutinizing the Hearing Officer's discrediting of petitioner's account of the July 2011 meeting, albeit without establishing an infirmity in this finding under the substantial evidence standard. The majority doubles down on the contradiction in stating that it finds that the Hearing Officer's determination "is not supported by substantial evidence and is contradicted by the documentary and testimonial evidence."[FN26]
The majority plainly recognizes that the Hearing Officer rejected the evidence on which petitioner based her claim that NYCHA had given oral "consent or approval" to her occupancy of the apartment, and finds the record sufficient to disparage the Hearing Officer's weighing of the evidence. If the majority truly believes that the existing record is bereft of substantial evidence to support the Hearing Officer's factfinding (and assuming that the majority is correct that the law permits the excuse of the requirement of written consent under petitioner's version of the facts), the majority should simply grant the petition and annul NYCHA's determination. By instead purporting to hold the proceeding "in abeyance" while remitting for further administrative [*13]factfinding on an issue that NYCHA has already addressed, the majority appears to be seeking to insulate its de facto annulment of NYCHA's determination from review by the Court of Appeals.
Regardless of the Resolution of the Factual Issue, the Determination Was Correct as a Matter of Law
For the foregoing reasons, no basis exists for the majority's de facto annulment of the Hearing Officer's rejection, on the facts, of petitioner's claim that Rios orally consented to her occupancy of the apartment. However, regardless of the veracity of petitioner's testimony to that effect, NYCHA's denial of her RFM claim was correct, as a matter of law. As the Court of Appeals reiterated just last year, "[W]ith rare exceptions [none applicable here, as more fully discussed below], estoppel is not available as a remedy to prevent a governmental agency from discharging its statutory duties" (West Midtown Mgt., 31 NY3d at 541-542; see also Schorr, 10 NY3d at 779 [same]; Matter of New York State Med. Transporters Assn. v Perales, 77 NY2d 126, 130 [1990] [same]; Columbus 95th St., LLC v New York State Div. of Hous. & Community Renewal, 81 AD3d 269, 281 [1st Dept 2010] ["it is well settled that estoppel cannot serve to bar a governmental agency from exercising its governmental functions"]).
Under the foregoing case law, even if (as petitioner claims) Rios knowingly acquiesced in her occupancy of the apartment for at least one year before her mother's death, such acquiescence would in no way diminish NYCHA's right, and duty, to deny petitioner RFM status on the ground that she failed to obtain written permission for her occupancy, as required by NYCHA's rules (see Schorr, 10 NY3d 776 [the landlord's acquiescence in the continued residence in a Mitchell-Lama apartment by the son of the tenants of record after the tenants of record vacated did not estop the landlord or the relevant city agency to deny the son succession rights, for which he did not qualify]; Matter of Jian Min Lei v New York City Dept. of Hous. Preserv. & Dev., 158 AD3d 514, 515 [1st Dept 2018] [following Schorr in the context of a similar claim to succession rights to a Mitchell-Lama apartment]).
The majority dismisses the principle that estoppel does not lie against a government agency by asserting that petitioner "has not argued estoppel." On the contrary, petitioner's counsel specifically argued at the hearing, in reliance on Matter of McFarlane v New York City Hous. Auth. (9 AD3d 289 [1st Dept 2004]) (a decision I discuss below) that, based on Rios's oral consent at the July 2011, NYCHA should be precluded from enforcing its written-consent requirement. This is plainly an estoppel argument, whether or not the word "estoppel" was used.
The majority further argues that granting the petition would be consistent with the case law I cite "because there is no federal statute or regulation that requires that NYCHA's consent to a permanent residency request be in writing." While it is true that federal law does not mandate that an agency's consent to the addition of a new household member (which consent federal regulations do require) be in writing, the fact remains that NYCHA's own rules (implemented in order to comply with federal law) require that the consent be memorialized in writing. To preclude NYCHA from enforcing its own rule on this point against petitioner — in effect, to require NYCHA to give one individual preferential treatment vis-a-vis other housing applicants, many of whom may be in greater need, based on the preferred individual's uncorroborated account of the statements and conduct of one NYCHA manager in her particular case — is to apply estoppel against the government, contrary to the teaching of the Court of Appeals and against the weight of this Court's own authority. Whether the requirement in question is embodied in a statute, a regulation or (as here) an agency's internal rule-book, the principle that estoppel does not lie against the government serves to ensure that the government deals with all persons fairly, equitably and consistently, without giving anyone inappropriately preferential treatment. Here, preferential treatment is essentially what petitioner seeks.[FN27]
Any estoppel rationale for disturbing NYCHA's determination is untenable under the Court of Appeals' firm commitment, confirmed only months ago in West Midtown Mgt. (31 NY3d at 541-542), to the principle that a governmental agency cannot be estopped to carry out its duties [FN28]. While this principle may be subject to "rare exceptions" (id. at 541), the majority does not identify — nor am I aware of — any such exception recognized by the Court of Appeals that would apply to this case. There is an exception potentially applicable "in unusual factual situations to prevent injustice" (id. at 542 [internal quotation marks omitted]), but this exception is limited to "the rarest cases" (id. [internal quotation marks omitted]).
Although petitioner's situation naturally evokes a substantial measure of sympathy, this matter — in which petitioner seeks "to bypass the 250,000-household waiting line" for NYCHA housing (Matter of Aponte v Olatoye, 30 NY3d 693, 698 [2018]) and to override that agency's policy of "prioritizing children in need and persons facing homelessness when allocating its insufficient stock of public housing" (id.) — is "not one of those rare cases where . . . estoppel would be warranted to prevent an injustice" (West Midtown Mgt., 31 NY3d at 542). Assuming the truth of petitioner's testimony about the July 2011 meeting (which the Hearing Officer rejected as "incredible"), Rios made no promise that she would receive RFM status at the end of her mother's tenancy. Rather, Rios simply told petitioner that she could remain in the apartment to take care of her mother — a promise that was kept in full, as no effort was made to end petitioner's occupancy until after her mother's passing.[FN29]
Further, the PPR form that petitioner filled out and allegedly tendered to Rios at the July 2011 meeting gave her notice that, if Rios denied the request for permanent residency, she would have the right to "request a grievance hearing to review [his] decision." Nevertheless, by her own account, petitioner (or, adopting the majority's supposition that petitioner's mother was "lucid" at the meeting, Speights) simply acquiesced when Rios handed the PPR back to her without acting on it [FN30]. Had petitioner (or her mother, the signatory of the PPR) at that point [*14]insisted that Rios act on the PPR one way or the other, and then pursued her request through higher administrative channels and, if necessary, the courts (as petitioner is doing now, on her own initiative, with regard to her claim for RFM status), the claim might well have prevailed and, upon her mother's death in September 2013, petitioner would have succeeded to the tenancy. Even if her account of the July 2011 meeting is accurate, petitioner lost this opportunity due to her own (or her mother's) deliberate inaction. Contrary to the majority's assertion, there is nothing "speculative" in my saying this — it is the necessary implication of petitioner's own testimony, taken at face value.[FN31]
As the majority necessarily concedes, ample precedent from this Court stands for the proposition — consistent with the general rule stated in West Midtown Mgt. (31 NY3d at 541-542) and Schorr (10 NY3d at 779) — that a claimant to succession rights to an NYCHA apartment cannot invoke estoppel to avoid the requirement that the claimant show that NYCHA gave written consent to his or her occupancy of the apartment as a member of the previous tenant's household (see Matter of McBride v New York City Hous. Auth., 140 AD3d 415, 416 [1st Dept 2016]; Matter of Andrade v New York City Hous. Auth., 132 AD3d 598 [1st Dept 2015]; Matter of Dancil v New York City Hous. Auth., 123 AD3d 442 [1st Dept 2014]; Matter of King v New York City Hous. Auth., 118 AD3d 636 [1st Dept 2014]; Matter of Gonzalez v New York City Hous. Auth., 112 AD3d 531 [1st Dept 2013]; Matter of Rahjou v Rhea, 101 AD3d 422 [1st Dept 2012]; Matter of Adler v New York City Hous. Auth., 95 AD3d 694 [1st Dept 2012], lv dismissed 20 NY3d 1053 [2013]; Rosello v Rhea, 89 AD3d 466 [1st Dept 2011]; Matter of Edwards v New York City Hous. Auth., 67 AD3d 441 [1st Dept 2009]).[FN32]
The majority attempts to distinguish the bulk of the cases cited in the foregoing paragraph on the ground that in each there supposedly was "a valid reason to deny the remaining family [*15]member grievance, aside from a lack of written consent" to the claimant's occupancy. This attempted distinction does not bear scrutiny, as none of these decisions states that the lack of written consent to the occupancy, by itself, would not have been sufficient to deny the claim. Similarly without merit is the majority's argument that most of these cases are distinguishable because "the tenant never requested that the petitioner be added as a permanent resident." Assuming that the majority's characterization of the cases is accurate, the instant case is not materially different. As previously discussed, according to petitioner's testimony, at the July 2011 meeting, she and her mother voluntarily withdrew the PPR seeking written consent to her occupancy after Rios handed it back to them, without acting on it, while telling them that petitioner could stay in the apartment to care for her mother but could not be placed on the lease. Having chosen to drop the PPR at that point, petitioner should not be accorded more favorable treatment than an occupant who never requested NYCHA's permission to join a tenant's household permanently.
In seeking to relieve petitioner of the consequences of her decision (by her own account) to withdraw her request for written approval of her occupancy, the majority relies on McFarlane (9 AD3d 289 [1st Dept 2004]) (the decision cited by petitioner's counsel at the hearing), and on six subsequent decisions by this Court citing McFarlane. McFarlane contains dicta suggesting that the requirement of written consent may be excused where NYCHA has "implicitly approved" the occupancy (id. at 291). Initially, even if McFarlane and each of the cases citing it specifically held that the written consent requirement may be excused, we would be bound to follow the binding (and recently reaffirmed) contrary holding of the Court of Appeals that estoppel cannot be invoked to bar the performance of a governmental function [FN33]. However, the language from McFarlane on which the majority relies is (as just noted) dicta, and the same is true of the relevant portions of four of the six subsequent cases cited by the majority in this regard [FN34]. To the extent the remaining two cases arguably held that the written consent [*16]requirement may be excused by NYCHA's acquiescence to the claimant's occupancy, I believe that we should instead follow the contrary holding of the Court of Appeals, of our more recent decision in McBride (140 AD3d at 416), and of the clear weight of authority in this Court.
Conclusion
In closing, I again note my recognition of the sympathetic nature of petitioner's claim to succeed to her mother's tenancy. However, the families on "the 250,000-household waiting line" for NYCHA housing (Aponte, 30 NY3d at 698) are no less deserving of sympathy. The question here is whether petitioner should be permitted to jump to the front of that line — thereby overriding NYCHA's policies of "prioritizing children in need and persons facing homelessness" (id.) — based on her claim that the NYCHA property manager acquiesced in her occupancy after she and her mother dropped their request for the requisite written approval. NYCHA, after a hearing at which petitioner was represented by counsel, rejected her testimony about her interaction with the property manager and denied her claim. Upon our review under CPLR article 78, I see no basis for setting aside this determination, which is both supported by substantial evidence and compelled by the principle that NYCHA cannot be estopped to enforce the requirement that its written approval be requested and granted for additions to a tenant's household. Nor do I see any basis for the majority's remanding the matter back to NYCHA for a further hearing on an issue that the agency has already addressed.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: FEBRUARY 14, 2019
CLERK



Footnotes

Footnote 1:There had been three days of hearing before a different hearing officer, who then became unavailable. On November 19, 2015, the parties asked to proceed with a de novo hearing that day. Hearing Officer Ambert agreed, and returned all of the exhibits from the earlier hearing to the parties. Given this stipulation and ruling, this Court may not consider the transcript of the earlier hearing, included in respondent's appendix. Nonetheless, the dissent improperly discusses the testimony from the earlier dates.

Footnote 2:Accordingly, contrary to our dissenting colleague's characterization of Porter's testimony about her mother's condition, Porter's observation that her mother was lucid that day was entirely consistent with her testimony that she was reluctant to interfere in the conversation between Rios and her mother.

Footnote 3:The dissent's speculative statements that Porter may have deliberately acquiesced in Rios's failure to give them a written decision and that Porter or her mother "voluntarily withdrew" the request have no support in the record, were not found by the Hearing Officer, and were not argued by NYCHA.

Footnote 4:Our dissenting colleague notes that the Permanent Permission Request form also provides that a tenant may request a grievance hearing to review the manager's decision, and faults Porter for not having sought a hearing immediately after the July 2011 meeting with Rios. However, Porter, who was not the tenant of record, did not have a right to request a grievance hearing. Moreover, under provisions of the NYCHA Manual, the right to a grievance hearing would only have been triggered by the written completion of the form as "disapproved," which Rios failed to do. As the Legislature recently recognized in enacting Public Housing Law § 402-c, "When NYCHA's denial precedes the ability of a resident to institute a grievance procedure, a baseless, verbal communication of that denial does not give residents adequate information to take full advantage of the grievance process. A written notice articulating the reasons for denial would give residents the ability to contest those reasons and equal footing in grievance proceedings" (Sponsor's Mem, Bill Jacket, L 2016, ch 335, 2016 NY Legis Ann at 194).

Footnote 5:Contrary to the statement of our dissenting colleague, the Hearing Officer did not find that all of Porter's testimony was incredible. Rather, she found "incredible" only Porter's explanation for not interfering in the conversation between her mother and Rios. As discussed further below, the stated basis for this finding is not supported by substantial evidence because Porter did not have power of attorney for her mother in July 2011, and the only evidence of Speights's cognitive condition at that time was Porter's testimony that her mother was lucid and understood what she was doing during the July 2011 meeting. 

Footnote 6:The motion court also dismissed the petition as to Porter's adult son because he had not signed or verified the petition, but that ruling is not appealed.

Footnote 7:Contrary to our dissenting colleague's characterization of our holding today, we do not take issue with the Hearing Officer's other factual findings. We do not "annul," "disparage," or "re-weigh[]" those findings or remand for "further administrative factfinding." Rather, we remand only for a determination on the existing record of whether Porter is entitled to remaining family member status because she resided in the apartment with NYCHA's knowledge or consent for a year or more before her mother's death.

Footnote 8:Haug (32 NY3d 1044 [2018], supra), cited by our dissenting colleague, has no application to this aspect of our ruling, since we are not finding that the Hearing Officer's determination was or was not supported by substantial evidence. Rather, we find that the record is inadequate for review by this Court because the Hearing Officer failed to make a determination on the issue raised by Porter. Furthermore, to the extent that the dissent cites to Haug for the proposition that hearsay is admissible at an administrative hearing, that principle is not applicable in this case, because the Hearing Officer did not cite to or rely on any hearsay evidence in reaching her determination.

Footnote 9:In other cases cited by respondent, the request was made less than one year before the tenant's death or departure, so that the requirement that petitioner have resided with the tenant for a continuous period of one year before the tenant's death or departure could not have been met (see Matter of Vereen v New York City Hous. Auth., 123 AD3d 478 [1st Dept 2014]; Matter of Perez v New York City Hous. Auth., 99 AD3d 624 [1st Dept 2012]). However, those cases are not relevant here, in light of Porter's testimony and the documentary evidence showing that she resided with her mother for more than one year before her death.

Footnote 10:Respondent and the dissent also cite to Matter of Dancil v New York City Hous. Auth. (123 AD3d 442 [1st Dept 2014]) and Matter of Rahjou v Rhea (101 AD3d 422 [1st Dept 2012]). The facts of these cases are not discussed in the published opinions. However, each case cites to Adler (95 AD3d 694), in which the petition was properly denied because no request had ever been made to add the petitioner as a permanent member of the household (see Matter of Adler, 31 Misc 3d 1205[A], 2011 NY Slip Op 50499[U] [Sup Ct NY County 2011]). In addition, the dissent cites to Matter of McBride v New York City Hous. Auth. (140 AD3d 415 [1st Dept 2016]). However, in that case, we noted that there was "no basis upon which to relieve petitioner of the written consent requirement" (id. at 416, citing McFarlane, 9 AD3d 289). Here, the Hearing Officer failed to address Porter's McFarlane argument.

Footnote 11:I refer to the edition of the Manual dated December 12, 2012, which is reproduced in pertinent part in respondent's appendix and apparently was in effect at the relevant time.

Footnote 12:Although petitioner had resided in the apartment with NYCHA's authorization years before, it is undisputed that only her alleged continuous occupancy immediately preceding her mother's death is relevant to her claim to succession rights.

Footnote 13:Indeed, petitioner testified that her mother's dementia, along with her other health problems, was the reason petitioner had moved back into the apartment in November 2010.

Footnote 14:While the Court of Appeals recognized in West Midtown Mgt. that there are "rare exceptions" to the unavailability of estoppel against the government (31 NY3d at 541), no such exception applies in the context presented by this proceeding, as more fully discussed below.

Footnote 15:The majority, perhaps recognizing that the record affords no basis for annulling the determination under review, avoids stating that the determination is being annulled, but such an annulment is, in fact, the result of the majority's decision. This point will be further discussed below.

Footnote 16:Specifically, paragraph 5(b) of the lease provides:
"The Tenant shall obtain the written consent of the Housing Manager of the development in which the Leased Premises is [sic] located ( Development'), or such Housing Manager's designee, before allowing any person to reside in the Leased [P]remises other than a family member named in the Tenant's signed application or born or adopted into the household, or subsequently authorized by the Landlord, who remains in continuous occupancy since the inception of the tenancy, since birth or since subsequent authorization by the Landlord."

Footnote 17:NYCHA ultimately dismissed the claims of both petitioner and Tyvon. Although the subsequent pro se article 78 petition names both petitioner and Tyvon in the caption, the latter neither signed nor verified the petition. In the order transferring the proceeding to this Court, Supreme Court dismissed the petition insofar as purportedly brought by Tyvon, noting that petitioner lacks standing to pursue claims on Tyvon's behalf and that, as a non-attorney, she cannot represent him in this matter. Because Tyvon is no longer a party to this proceeding, I shall discuss evidence relating to his claim only insofar as it bears on petitioner's claim or her credibility.

Footnote 18:An earlier set of hearings was held before a different Hearing Officer on June 26 and December 12, 2014, and March 31, 2015. After those dates, the matter was reassigned to Hearing Officer Ambert and the parties stipulated to restart the hearing de novo. Accordingly, the determination under review was based solely on the evidence presented at the hearing of November 19, 2015. I summarize only the evidence that, in my view, bears upon the question of whether NYCHA's determination is supported by substantial evidence.

Footnote 19:Petitioner testified that she had "filled out the majority of [the PPR] except for the places where my mother had to put her signature on my information there." When asked whether she had "read it to her [Speights] before she signed it," petitioner responded, "Yeah, she — I read it to her. She knew what was going on the form. I mean, she was a little shaky but it wasn't so bad. She had a lot of lucid moments at that time." The majority mischaracterizes petitioner's brief snippet of testimony that Speights still experienced "lucid moments" in July 2011 — given solely as evidence that Speights understood the purpose of the PPR at the moment she signed it — as a claim that Speights was lucid for all of "that day" on which she and petitioner met with Rios. No such testimony exists in the record. In fact, petitioner specifically testified that Rios, at the July 2011 meeting, was "speaking to someone that he was aware that was disabled, and my mother certainly was disabled . . . . My mother was — she had dementia."

Footnote 20:However, the PPR form that petitioner and her mother completed states, "If permanent permission is not granted (disapproved), you may request a grievance hearing to review the Development Manager's decision."

Footnote 21:Although not mentioned by the majority, the petition alleges — inaccurately — that "[p]etitioner testified that her mother was lucid and still in charge of her conversations during the July 2011 meeting[.]" In fact, as previously noted, petitioner testified at the hearing that her mother had developed dementia in mid-2010, long before the July 2011 meeting. When asked "when [her mother] started to decline and get dementia," petitioner responded, "That was around the middle of 2010." Later during the hearing, as previously noted, petitioner testified — with specific reference to the July 2011 meeting — that Rios had been "speaking to someone that he was aware that was disabled, and my mother certainly was disabled . . . . My mother was — she had dementia."

Footnote 22:Even if the Hearing Officer lost sight of the fact that the power of attorney was not executed until after the July 2011 meeting (and we have no basis on which to find that she made such a factual error), it would not change the fact that Speights's dementia at the time of the meeting, by itself, provides substantial evidence to support the Hearing Officer's finding.

Footnote 23:Because this Court's task under CPLR 7803(4) is to scour the "entire record" to determine whether the administrative determination is supported by substantial evidence, that the Hearing Officer "did not cite to or rely on" a particular piece of record evidence supporting her decision (as the majority claims) is irrelevant to our duty to consider that evidence in reviewing the decision.

Footnote 24:It also bears mention that, even after the April 2013 discussion with Festus (in which Festus specifically invited petitioner to submit a PPR to add herself to the lease), petitioner still did not submit a PPR at any time before her mother's death the following September. This suggests that petitioner's failure to file a PPR before April 2013 may have been attributable to her own oversight or calculation, rather than to Rios's alleged instructions.

Footnote 25:I make reference to Rios's testimony (which was not part of the record on which the determination was made) only to rebut the majority's attempt to fault NYCHA for its decision not to call Rios as a witness at the de novo hearing. There is nothing "improper[]" in my discussing this testimony for the purpose of rebutting the majority's use of NYCHA's choice not to call Rios at the de novo hearing to bolster the result the majority reaches, when the majority knows that Rios's testimony at the de novo hearing would have added nothing substantial to the record. To reiterate, Gray's testimony at the de novo hearing about her conversation with Rios, although hearsay, constituted admissible evidence in this administrative proceeding.

Footnote 26:The majority asserts that the Hearing Officer did not reject "all" of petitioner's testimony but only her "explanation for not interfering in the conversation between her mother and Rios." Plainly, the Hearing Officer found that petitioner's implausible explanation for deferring to her infirm mother at the July 2011 meeting discredited petitioner's account of that meeting, which was the basis on which petitioner asserted that the written consent requirement should be excused. Assuming (as the majority does) that the written consent requirement can be excused, Rios's oral assent to petitioner's residence in the apartment at the meeting would support petitioner's claim, regardless of which of the two women Rios had been addressing. The question of whether petitioner deferred to her mother at the July 2011 meeting has no significance apart from its bearing on the credibility of petitioner's claim that Rios orally assented at that meeting to petitioner's residing in the apartment.

Footnote 27:Contrary to the majority's assertion, paragraph 5(b) of Speights's lease (quoted in full at footnote 6 above) expressly requires the tenant to "obtain the written consent of the Housing Manager . . . before allowing any person to reside in the Leased premises." The exception for persons "authorized by the Landlord" subsequent to the tenant's original application obviously means persons for whom written consent was previously given — otherwise the same paragraph's "written consent" requirement would be meaningless.

Footnote 28:Indeed, by citing Schorr for this proposition with approval in West Midtown Mgt. (31 NY3d at 542), the Court of Appeals confirmed that the principle continues to have full application in the governmental housing program context.

Footnote 29:The limited nature of Rios's alleged promise is confirmed by petitioner's letter to Rios, dated December 11, 2013, requesting RFM status, in which she wrote, "You advised us that I couldn't get on the permanent lease. You authorized me to move in to care for my mother. . . . My mom had the understanding that we [petitioner and Tyvon] would be there as long as she needed us because her condition was declining." Similarly, in petitioner's subsequent letter requesting a grievance hearing, she wrote, "Mr. Rios said that I could not go on the permanent lease. . . . I was allowed to move in and no time frame was discussed."

Footnote 30:As previously discussed, in her testimony at the hearing, petitioner explained her passivity at the July 2011 meeting as due to her deference to her mother — who, according to petitioner's own testimony, was already suffering from dementia at the time. The Hearing Officer quite reasonably found that this testimony rendered petitioner's entire account of the July 2011 meeting "incredible." But if Speights really was lucid and making her own decisions at the meeting (which seems to be how the majority interprets the record), then it was Speights who decided not to press the matter when Rios handed back the PPR, and the same conclusion follows — the PPR was withdrawn. It also bears mention that, assuming that the July 2011 meeting occurred substantially as described by petitioner, there may well have been an element of calculation in the acquiescence (whether by petitioner or her mother) to Rios's failure to act on the PPR. Had petitioner been added to the household, the inclusion of her income in calculating the rent would have resulted in a higher rent.

Footnote 31:The majority refers to a statute enacted long after the relevant events took place, Public Housing Law § 402-c (effective December 28, 2016), which requires that NYCHA put in writing any denial of a request that would entitle a tenant to a grievance. While this seems to me to be a salutary law, it was not in effect at any time relevant to this case.

Footnote 32:The majority attempts to distinguish McBride (140 AD3d 415 [1st Dept 2015]) on the ground that, while in that case we found that there was "no basis upon which to relieve petitioner of the written consent requirement" (id. at 416), "[h]ere," according to the majority, "the Hearing Officer failed to address [petitioner's] McFarlane argument." As I have already argued at length, the Hearing Officer did address that argument, and rejected it.

Footnote 33:In this case, of course, the governmental function that the majority seeks to bar NYCHA from performing is the latter's enforcement of its rule, incorporated in its tenants' leases, that its written consent must be obtained for the addition of a new adult member of a tenant's household. That rule, to reiterate, was adopted to conform to the federal mandate to NYCHA that its tenants request its approval for any additional occupant of an apartment (24 CFR 966.4[a][v]).

Footnote 34:In fact, in McFarlane we confirmed NYCHA's denial of a claim for RFM status on the ground that the petitioners therein had "failed to apply for and obtain the written consent of management to become a permanent member of the tenant family during the . . . [prior] tenancy" (9 AD3d at 289). The language of the case on which the majority relies — speculating that, in the absence of written consent to the occupancy of a claimant to RFM status, it "could be of critical importance . . . that [NYCHA] was aware of the petitioner having taken up residence in the unit, and implicitly approved it" (id. at 291) — had no bearing at all on the result we reached. As McFarlane notes, "neither of the petitioners offered evidence showing that the agency was aware of their presence" in the subject apartment before the deaths of the tenants of record (id.). Similarly, as just noted, in four of the six cases citing McFarlane on which the majority relies, the citations of McFarlane came by way of dicta (see Matter of Taylor v Olatoye, 154 AD3d 634, 634 [1st Dept 2017] [in confirming the denial of RFM status, the decision cites McFarlane after noting that "(t)he record affords no basis for relieving petitioner of the written consent and income affidavit requirements"]; Matter of Gutierrez v Rhea, 105 AD3d 481, 486 [1st Dept 2013] [the denial of RFM status was annulled, and the matter remanded for a new hearing, because the record showed that "NYCHA's purported denial of (the petitioner's deceased mother's) 2004 request to add (the petitioner) to her household was not supported by substantial evidence," in that the mother had been "deprived of the opportunity to which she was entitled to compile and present evidence of her son's rehabilitation"]; Matter of Echeverria v New York City Hous. Auth., 85 AD3d 580, 581 [1st Dept 2011] [in confirming the denial of RFM status because the petitioner "did not enter the apartment lawfully, and never received written permission for permanent occupancy from housing management," we noted that the petitioner "failed to demonstrate that respondent knew or implicitly approved of her residency"]; Matter of Filonuk v Rhea, 84 AD3d 502, 503 [1st Dept 2011] [in confirming the denial of RFM status, we noted that "there is no evidence that NYCHA knew or implicitly approved of (the petitioner's) occupancy in the apartment" before the previous tenant's death]).